ORAL ARGUMENT NOT YET SCHEDULED

No. 15-7027

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CANDICE MILES,

*Plaintiff-Appellant,*

v.

HOWARD UNIVERSITY,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the District of Columbia

_____

**BRIEF OF APPELLEE HOWARD UNIVERSITY**

_____

Daniel I. Prywes
(Counsel of Record)
Brenda A. González
BRYAN CAVE LLP
1155 F Street, N.W.
Washington, D.C.  20004-1312
(202) 508-6000

Date:  October 21, 2015          *Counsel for Appellee Howard University*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Appellee Howard University ("Howard") certifies as follows:

## I.    Parties

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief of Appellant Candice Miles.

## II.    Rulings

Candice Miles has appealed the trial court's grant of Howard's motion for summary judgment on March 16, 2015.  (JA at 1034, 1035-1066.)

## III.    Related Cases

Howard's counsel is not aware of any related cases.

Respectfully submitted,

Daniel I. Prywes (Counsel of Record)
Brenda A. González
BRYAN CAVE LLP
1155 F Street, NW
Washington, DC  20004-1312
(202) 508-6000

Date:  October 21, 2015        *Counsel for Appellee Howard University*

i

## RULE 26. 1 DISCLOSURE STATEMENT OF APPELLEE HOWARD UNIVERSITY

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, appellee Howard University submits this Disclosure Statement.

Howard University was chartered by Act of Congress in 1867. Howard University has no stock or parent corporation, and no publicly held company owns 10 percent or more of the ownership interest in Howard University since it has no stock. Howard University is an educational institution.

Respectfully submitted,

Daniel I. Prywes
(Counsel of Record)
Brenda A. González
BRYAN CAVE LLP
1155 F Street, N.W.
Washington, DC  20004-1312
(202) 508-6000

*Counsel for Appellee Howard University*

ii

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.............. i

RULE 26. 1 DISCLOSURE STATEMENT OF APPELLEE HOWARD UNIVERSITY ..........................................................................................ii

TABLE OF CONTENTS ........................................................................iii

TABLE OF AUTHORITIES.................................................................... iv

GLOSSARY ........................................................................................viii

STATEMENT OF JURISDICTION ......................................................... 1

COUNTER-STATEMENT OF THE ISSUES........................................... 1

STATUTES AND REGULATIONS ......................................................... 2

COUNTER-STATEMENT OF THE CASE................................................ 2

SUMMARY OF ARGUMENT.............................................................. 27

STANDARD OF REVIEW.................................................................... 29

ARGUMENT ...................................................................................... 30

    I.     THE LOWER COURT PROPERLY RULED THAT HOWARD WAS NOT A "JOINT EMPLOYER" OF MILES ............................. 30

    II.    IN ITS ALTERNATIVE RULING, THE LOWER COURT PROPERLY GRANTED SUMMARY JUDGMENT ON THE FMLA AND DC FMLA CLAIMS...................................................... 38

    III.   IN ANOTHER ALTERNATIVE RULING, THE LOWER COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON MILES' CLAIMS UNDER THE DCHRA AND TITLE VII..... 45

CONCLUSION ................................................................................... 46

CERTIFICATE OF COMPLIANCE ...................................................... 47

# TABLE OF AUTHORITIES

## *Cases*

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ................................................................. 29

Barbour v. Browner,
    181 F.3d 1342 (D.C. Cir. 1999) ............................................... 39

*Brady v. Office of the Sergeant at Arms,
    520 F.3d 490 (D.C. Cir. 2008) ........................................... 39, 46

Burley v. National Passenger Rail Corp., No. 14-7051,
    No. 14-7051, 2015 U.S. App. LEXIS 16626 (D.C. Cir. Sept. 18, 2015) ............ 29

Chang v. Institute for Public-Private Partnerships, Inc.,
    846 A.2d 318 (D.C. 2004) ....................................................... 30

Cruz-Lovo v. Ryder Systems, Inc.,
    298 F. Supp. 2d 1248 (S.D. Fla.), *aff'd*, 88 F. App'x 381 (11th Cir. 2003) ......... 31

Dunkin' Donuts Mid-Atlantic Distribution Center, Inc. v. NLRB,
    363 F.3d 437 (D.C. Cir. 2004) ................................................ 30

In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation,
    683 F.3d 462 (3d Cir. 2012) .................................................... 31

Gibbs v. WMATA,
    48 F. Supp. 3d 110 (D.D.C. 2014) .......................................... 45

*Gleklen v. Democratic Congressional Campaign Committee, Inc.,
    199 F.3d 1365 (D.C. Cir. 2000) ................................. 29, 38, 40, 45

Gordon v. U.S. Capitol Police,
    778 F.3d 158 (D.C. Cir. 2015) ................................................ 40

*Authorities upon which we chiefly rely are marked with asteriks.

Hopkins v. Grant Thornton International,
    851 F. Supp. 2d 146 (D.D.C. 2012), *aff'd*, 529 F. App'x 1 (D.C. Cir. 2013)....... 45

Jacobson v. Comcast Corp.,
    740 F. Supp. 2d 683 (D. Md. 2010) .................................................................. 37

Knitter v. Corvias Military Living, LLC,
    758 F.3d 1214 (10th Cir. 2014)................................................... 31, 35, 37

Kumar v. District of Columbia Sewer & Water Authority,
    25 A.3d 9 (D.C. 2011)..................................................................................... 30

McFadden v. Ballard Spahr Andrews & Ingersoll, LLP,
    611 F.3d 1 (D.C. Cir. 2010) ........................................................................... 45

Moldenhauer v. Tazewell-Pekin Consolidated Communications Center,
    536 F.3d 640 (7th Cir. 2008).......................................................................... 31

Moreau v. Air France,
    356 F.3d 942 (9th Cir. 2004).......................................................................... 37

Morrison v. Magic Carpet Aviation,
    383 F.3d 1253 (11th Cir. 2004)....................................................................... 35

*Neuren v. Adduci, Mastriani, Meeks & Schill,
    43 F.3d 1507 (D.C. Cir. 1995) ....................................................................... 42

New York v. EPA,
    413 F.3d 3 (D.C. Cir. 2005) ........................................................................... 46

*NLRB v. Browning-Ferris Industries of Pennsylvania,
    691 F.2d 1117 (3d Cir. 1982)........................................................... 7, 16, 31

Orozco v. Plackis,
    757 F.3d 445 (5th Cir. 2014)........................................................................... 37

Plaso v. IJKG, LLC,
    553 F. App'x 199 (3d Cir. 2014) ..................................................................... 31

\*Redd v. Summers,
   232 F.3d 933 (D.C. Cir. 2000) .......................................7, 9, 13, 30, 31, 33, 34, 36

Santichen v. Greater Johnstown Water Authority,
   No. CIV A 06-72 J, 2008 WL 868212 (W.D. Pa. Mar. 31, 2008)................ 33, 35

Simms v. District of Columbia Government,
   587 F. Supp. 2d 269 (D.D.C. 2008) ............................................................. 33, 34

Solomon v. Vilsack,
   763 F.3d 1 (D.C. Cir. 2014) ............................................................................... 28

Spears v. Choctaw County Commission,
   No. 07-275, 2009 WL 2365188 (S.D. Ala. July 30, 2009) ................................ 33

\*Spirides v. Reinhardt,
   613 F.2d 826 (D.C. Cir. 1979) ........................................................................... 7

Talavera v. Shah,
   638 F.3d 303 (D.C. Cir. 2011) ......................................................................... 29

Vrabel v. Greater Johnstown Water Authority,
   No. 3:2006-73, 2008 WL 868152 (W.D. Pa. Mar. 31, 2008) ............................ 34

Wilburn v. Robinson,
   480 F.3d 1140 (D.C. Cir. 2007) ....................................................................... 29

Zheng v. Liberty Apparel Co.,
   355 F.3d 61 (2d Cir. 2003) ............................................................................... 37

### *Statutes*

29 U.S.C. §§ 2611 *et seq.* ...................................................................................... 4

29 U.S.C. § 2615 .................................................................................................. 30

42 U.S.C. § 2000e-5 ............................................................................................. 30

D.C. Code §§ 2-1401.01 *et seq.* ............................................................................. 4

D.C. Code § 2-1402.11(a)(1) ........................................................................ 30

D.C. Code § 32-507 ..................................................................................... 30

D.C. Code §§ 32-501 *et seq.* ....................................................................... 4

## *Rules*

Fed. R. Civ. P. 56(a) ................................................................................... 29

# GLOSSARY

| | |
|---|---|
| "ASBDC" | Association of Small Business Development Centers |
| "DC FMLA" | District of Columbia Family and Medical Leave Act, D.C. Code §§ 32-501 to 32-517 |
| "DCHRA" | District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01 to 2-1431.08 |
| "DC SBDC" | District of Columbia Small Business Development Center Network |
| "FMLA" | Family and Medical Leave Act, 29 U.S.C. §§ 2611-19 (2012) |
| "Howard" | Appellee Howard University |
| "HU SMUF" | Howard University's Statement of Material Undisputed Facts (JA 168-95) |
| "Lead Center" | Howard Lead Center |
| "Miles" | Appellant Candice Miles |
| "Pl. SMFD" | Plaintiff's Statement of Material Facts in Dispute (JA 708-73) |
| "Reply SMUF" | Howard University's Reply to Plaintiff's Statement of Material Facts in Dispute (JA 965-1011) |
| "SBA" | U.S. Small Business Administration |
| "SOP" | Standard Operating Procedures |
| "Title VII" | Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to e-17 |
| "UDC" | University of the District of Columbia |

## STATEMENT OF JURISDICTION

Appellee Howard University ("Howard") adopts appellee Candice Miles' ("Miles") "Statement of Jurisdiction."

## COUNTER-STATEMENT OF THE ISSUES

1.    Whether the court below properly granted summary judgment on all claims to Howard on grounds that no reasonable jury could conclude that Howard was a "joint employer" of Miles (a subcontractor's employee) after the court's careful review of both parties' evidence in which the court relied on undisputed evidence and rejected those of Miles' contentions that were either not material or not supported by admissible evidence.

2.    Whether the court below properly granted summary judgment to Howard on Miles' claims under the federal Family and Medical Leave Act ("FMLA") and D.C. Family and Medical Leave Act ("DC FMLA") on the independent ground that no reasonable jury could conclude that Howard lacked a legitimate business reason to terminate the UDC subcontract, once again based on a careful review of both parties' evidence that relied on undisputed facts and rejected those of Miles' contentions that were not supported by the record or were not material.

3.    Whether the court below properly granted summary judgment to Howard on Miles' claims under Title VII and the D.C. Human Rights Act

("DCHRA") in light of its finding and the undisputed evidence that Howard had a legitimate business reason for its actions.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Addendum of the Brief of Appellant.

## COUNTER-STATEMENT OF THE CASE

*Nature of the case.* This case arises from Howard's decision in May 2011 to terminate the University of the District of Columbia ("UDC") as a subcontractor on a small-business development grant awarded by the U.S. Small Business Administration ("SBA") to Howard. (JA 721, Plaintiff's Statement of Material Facts in Dispute ["Pl. SMFD"] No. 136.)

Howard operated the "Lead Center" under the SBA-funded grant. (JA 708-09, Pl. SMFD Nos. 1-2.) As a subcontractor, UDC operated on Connecticut Avenue one of four Service Centers offering small-business counseling services in different parts of the city. (JA 709, Pl. SMFD No. 3; JA 567.) UDC's

Miles was hired by UDC as Director of the UDC Service Center in January 2009, despite "reservations" by the Executive Director of the Howard Lead Center, who was then Henry Turner. (JA 709, 711, Pl. SMFD Nos. 4, 22.)

Howard terminated the UDC subcontract on May 24, 2011. (JA 721, Pl. SMFD No. 136.) UDC then terminated Miles as its employee (Miles Br. at 18),

and it is undisputed that UDC "did nothing to look for a new position for her" at UDC. (JA 721, Pl. SMFD No. 141.)

It was undisputed that, under Miles' leadership, the UDC Service Center was the worst performing center in the DC Small Business Development Center ("DC SBDC") network funded by SBA and led by Howard. (JA 714-15, 718, Pl. SMFD Nos. 55, 58, 90.)

Miles started pregnancy leave on March 7, 2011, a few weeks earlier than expected. (JA 714, Pl. SMFD No. 52.) In that period, Howard was facing an SBA threat to terminate the entire DC SBDC grant unless Howard took rapid action to restructure the DC SBDC network. (JA 717-18, Pl. SMFD Nos. 88-90.) The Congressionally-approved SBDC accrediting body - the Association of Small Business Development Centers ("ASBDC") - had recommended that Howard take a "hard look" at the UDC Service Center because its performance was "especially problematic." (JA 710, 715-16, Pl. SMFD Nos. 11, 62, 68, 69, 71.) ASBDC accreditation was critical to continued SBA funding of the DC SBDC grant. (JA 613.)

In May 2011, the same month that Howard terminated the UDC subcontract, Howard also terminated the second most senior executive (a male) with the Howard Lead Center for "unsatisfactory performance." (JA 709-10, Pl. SMFD Nos. 9, 13.) Howard had previously (1) encouraged the previous, male Director of

3

the UDC Service Center (who preceded Miles) to leave because of poor performance (JA 710, Pl. SMFD No. 16), and (2) criticized the performance of the prior male Executive Director of the Howard Lead Center (Henry Turner) which led to his departure. (JA 709, Pl. SMFD Nos. 6-7.) There was no evidence that anyone at Howard ever made any discriminatory comments about gender, pregnancy, persons who took FMLA leave, or persons with family responsibilities. (JA 711-12, Pl. SMFD Nos. 25-27.)

In March 2012, Miles brought suit against UDC and Howard. (JA 11.) In her Amended Complaint (JA 34), Miles alleged that she was a joint employee of both institutions, and that Howard's termination of the UDC subcontract violated her rights under the FMLA, the DC FMLA, Title VII, and the D.C. Human Rights Act ("DCHRA").[1] (JA 11.)

Miles later stipulated to the dismissal of her claims that Howard retaliated against her by refusing payment of her final paycheck. (JA 619.) She also settled her claims against UDC. (JA 112.)

*Howard's summary-judgment motion.* After extensive discovery, Howard moved for summary judgment (JA 117), and provided a Statement of Material Undisputed Facts ("HU SMUF") (JA 168-95) listing 144 items. Miles filed an

---

[1]     29 U.S.C. §§ 2611 *et seq*. (FMLA); D.C. Code §§ 32-501 *et seq*. (DC FMLA); 42 U.S.C. §§ 2000e *et seq*. (Title VII); D.C. Code §§ 2-1401.01 *et seq*. (DCHRA).

Opposition (JA 672), with a Statement of Material Facts in Dispute (Pl. SMFD) (JA 708-73) which admitted 83 of Howard's SMUFs and purported to dispute the rest. Howard then filed a Reply brief (JA 936), with a detailed Reply to Miles' itemization of disputed facts ("Reply SMUF") explaining why Miles' contentions were not supported by the record or were not material. (JA 965-1011.)

In a detailed 32-page opinion, the court below (per Judge Walton) evaluated both parties' evidence "in a light most favorable to the plaintiff and drawing all reasonable inferences in her favor." (JA 1046; *see* JA 1044.) Each fact recited by the court in its review of the "background" facts (JA 1036-44) was undisputed by Miles (JA 708-22), was derived from Miles' evidence, or referred to documents whose contents were undisputed. In its opinion, the lower court noted several times that Miles had "mischaracterized" or not "accurate[ly]" stated the record evidence. (JA 1052 n.12, 1059 n.15, 1060, 1063 n.19.) As shown below, Miles does the same in her appeal brief.

The district court granted Howard's summary-judgment motion on two independent grounds. (JA 1035-66.)

First, the court ruled that no reasonable jury could conclude on the basis of the undisputed evidence that Howard was a "joint employer" of Miles, such as to impose any "employer" duties on Howard with respect to Miles under the FMLA, DC FMLA, Title VII, or DCHRA. (JA 1052.)

Second, the court ruled that no reasonable jury could find that Howard's termination of the UDC subcontract was done to retaliate against Miles for exercising her right to take FMLA leave, to interfere with those rights, or for discriminatory purposes. The court relied on the undisputed evidence showing that Howard terminated the subcontract for legitimate business reasons—namely because "the UDC Service Center was the worst-performing center in the network, and Howard reasonably concluded that its performance would not improve." (JA 1058; *see* JA 1056, 1064.)

Miles' brief asserts that the lower court "credited" only the evidence submitted by Howard, and "failed to acknowledge key evidence" submitted by her. (Miles Br. at 2.) That is incorrect. We review next the court's factual basis for its rulings, the evidence it considered, and the undisputed facts.

*The Howard-UDC relationship.* Under the Howard-UDC subcontract, UDC committed to try to achieve specified "performance based milestones," such as a specified minimum number of counselling hours to be provided to small-business clients. (JA 568-69.) Howard promulgated Standard Operating Procedures ("SOP") for the DC SBDC network around December 2010. (JA 172, Pl. SMFD No. 31; JA 965.)

*The lower court's review of the "joint employment" evidence.* The court evaluated Miles' claim that Howard was a "joint employer" by applying the tests

stated in <u>Spirides v. Reinhardt</u>, 613 F.2d 826, 831-32 (D.C. Cir. 1979),[2] and <u>NLRB</u> <u>v. Browning Ferris Indus. of Pa.</u>, 691 F.2d 1117, 1123 (3d Cir. 1982).[3]  (JA 1045.)

The court noted that in <u>Redd v. Summers</u>, 232 F.3d 933, 940 (D.C. Cir. 2000), this Court suggested that it would be more inclined to follow the <u>Browning-Ferris</u> test in cases like this one involving allegations of "joint employment."  (JA 1045 & n.9.)

The lower court stated that it "[v]iew[ed] the facts in a light most favorable to the plaintiff and [drew] all inferences in her favor."  (JA 1046.)  Based on its review of both parties' evidence, the lower court found that "Howard was not a joint employer of the plaintiff" under the <u>Spirides</u> test.  (JA 1046-47)  The court cited numerous, <u>undisputed</u> facts to support these conclusions, largely based on Miles' admissions at her deposition:

---

[2]    As the court below noted, under the <u>Spirides</u> test, if the putative employer has "the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist."  613 F.2d at 831-32.  (JA 1046.)

[3]    As the court below noted, under the <u>Browning-Ferris</u> test, one company "contracting in good faith with an otherwise independent company" may be a joint employer where it "has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer."  691 F.2d at 1123.  (JA 1051-52.)  The two must share or co-determine the "essential terms and conditions of employment."  691 F.2d at 1123.

- The court found that Miles had "significant autonomy in directing the UDC Service Center and deciding what her day-to-day routine should be in order to advance the goals of the UDC Service Center." (JA 1047.) For example:

  o Miles "was responsible for preparing [the] UDC [Service Center]'s strategy to achieve the contractual goals specified in the [Howard-UDC] subcontract, as well as [the] work plans for the UDC Service Center." (JA 1047; JA 713, Pl. SMFD No. 42.)

  o Miles "was responsible for preparing the Strategic Action Plan for the UDC Service Center and for creating the Strategic Action Items for each of the Performance Indicators" prescribed in the subcontract. (JA 1047; JA 713, Pl. SMFD No. 42.)

  o Miles could "not recall that anyone at the Howard Lead Center ever told UDC that it had [to] follow a work plan, marketing plan, or strategic action plan written by Howard," or that "anyone at Howard ever ask[ed] her to change the strategic plans or work plans which she had prepared." (JA 1047; JA 713, Pl. SMFD No. 43.)

  o Miles was able to "create[] her own schedule to best address the goals of the UDC Service Center." (JA 1047; JA 713, Pl. SMFD No. 39.)

  o When "counseling clients[]" or "selecting topics for training workshops," Miles "use[d] her own professional judgment." (JA 1047; Pl.

8

SMFD No. 41.)  It was undisputed that Howard "never denied permission for [the] UDC [Service Center] to give a workshop that [it] proposed."  (Id.)

- Miles' "office was located at UDC," and she was "subject to UDC's leave policies."  (JA 1051; JA 712, Pl. SMFD No. 29.)  Miles was at UDC "almost every workday, and generally did not visit Howard's Lead Center more than a couple days a month."  (JA 1051; JA 712, Pl. SMFD No. 29.)  UDC also determined the leave policies that governed Miles.  (JA 1050; JA 552, Def. Ex. 13, at 53.)  The lower court noted that this Court found in Redd, 232 F.3d at 939-40, that such factors "suggest[ed] [the] lack of joint employment."  (JA 1050.)

- The SOP for the DC SBDC network stated that a Service Center Director is "responsible for the management and services provided at" her Service Center, and is "also responsible for the supervision of any staff" in that Service Center.  (JA 1048; JA 712, Pl. SMFD No. 31.)

- "Nowhere in the Standard Operating Procedures does it demonstrate that Howard directed and controlled the specific means by which the plaintiff fulfills her responsibilities as the UDC Service Center Director."  (JA 1048.)

- Under the SOP, Howard "never intended to convert the personnel at the UDC Service Center into Howard employees."  (JA 1049.)  Pursuant to the SOP, the personnel policies of each institution sponsoring a Service Center governed all of its employees' "personnel matters, including, but not limited to,

9

recruitment, hiring, fringe benefits, health and insurance plans, holidays, sick

leave, vacation leave, disciplinary actions, promotions, cost of living increments,

leaves of absence and termination." (JA 1049-50; *see* JA 712, Pl. SMFD No. 31.)

Each Service Center also determined its own "salaries, benefits, personnel

procedures and policies." (JA 1050; *see* JA 712, Pl. SMFD No. 31.)

- Howard had no authority to discipline Miles. (JA 1051; JA 713; Pl. SMFD No. 31.)

- When Miles left UDC, she listed UDC as her employer and a UDC Dean as her supervisor on job application forms, with no mention of Howard. (JA 1050; JA 713, Pl. SMFD No. 33.)

- UDC had Miles' personnel files.[4] (JA 1054; JA 712, Pl. SMFD No. 29.)

- UDC, and not Howard, "carried [Miles] on its payroll, issued her paychecks, and provided her with health and disability insurance." (JA 1051; JA, Pl. SMFD No. 29.)

The court below did not ignore, or "fail to acknowledge" or credit, Miles'

evidence that Howard provided some oversight of UDC. (Miles Br. at 2, 6-7, 9.)

---

[4]     Miles claims that the Service Centers were "required to file employment
records with the Lead Center." (Miles Br. at 7.) However, her supporting citation
to JA 780 shows only that copies of training forms were to be sent to the Howard
Lead Center's Director of Training.

The court noted that Howard, as the prime contractor on the SBA grant, "monitored the plaintiff for quality-control purposes," and "set out certain high-level personnel requirements for all Service Center employees to fulfill." (JA 1048.)  Toward this end, Howard could review "the adequacy of the [Service] [C]enter's staffing pattern, adherence to host institution procedures, and ability to provide core services during annual internal audits," and Howard also had requirements for training and orientation sessions.  (JA 1048-49; *see* JA 539, 541.) These all furthered Howard's goal to "remain eligible" for SBA funding.  (JA 1048; *see* JA 535, 539-41.)

The court found, however, that these features did not demonstrate that Howard "directed and controlled <u>the specific means</u> by which [Miles] fulfills her responsibilities as the UDC Service Center Director."  (JA 1048) (emphasis added.)  The court relied on several authorities for its conclusion that such "generic control exercised by a supervisor over an independent contractor" for "quality control" purposes is a common feature of contracting or subcontracting arrangements, and is insufficient to convert the supervising firm into a joint employer of the latter's employees under the <u>Spirides</u> test.  (JA 1049-51.)

11

The court also noted that Howard's decision to subcontract was a "prudent business decision" so that small-business services could be expanded to "different parts of the city."[5] (JA 1050.) There was no contrary evidence.

For substantially the same reasons, the court below concluded that Howard could not be considered a "joint employer" of Miles based on the <u>Browning-Ferris</u> test because Howard did not control the "essential terms and conditions" of Miles' employment. (JA 1051-56.) The court addressed both parties' evidence.

The court found that "it is undisputed that personnel matters such as workplace rules and conditions of employment were handled by UDC, not Howard." (JA 1053; *see* JA 794, SOP § 2.5(2)(A); JA 712, Pl. SMFD Nos. 29-31, at 16 (¶ 32).)

The lower court also observed that Miles' claim (Miles Br. at 6, 8) that Howard could "force" UDC to hire to particular individual is not "an accurate reflection of the record."[6] (JA 1052 n.12.)

---

[5]   *See* JA 545, SOP § 2.2(1)(G) ("Each DC SBDC Service Center will concentrate its services within the geographic area defined in its Director's Proposal").

[6]   Miles' citation to JA 815 (an excerpt of UDC Dean Mahone's deposition testimony) does not support her contention that Howard could "force" UDC to hire a particular individual. (Miles Br. at 6.) When the cited passage (JA 815) is reviewed in full, it is apparent that UDC's Dean Mahone disclaimed knowledge whether Howard could "force" UDC to hire someone over UDC's objection. (JA 493-44, Mahone Tr. 144-45.) Moreover, it is undisputed that UDC decided to hire

The court rejected Miles' argument that Howard was a joint employer because it had to "concur" in UDC's decision to hire her as the Director of the UDC Service Center. (JA 1052-53; *see* JA 552, SOP § 2.5.2(C).) Relying on this Court's ruling in <u>Redd</u>, 232 F.3d at 940, and several other rulings, the court reasoned that a "pre-screening" right over hiring did "not equate to a sufficient control of the terms and conditions of the Plaintiff's employment because once a Service Center Director is hired, Howard lacks the authority to fire the Director." (JA 1052.)

The court also rejected Miles' argument that Howard was a joint employer because it could *de facto* "terminate [plaintiff's] employment through its rescission of the UDC sub-grant." (Miles Br. at 27.) The court cited <u>Redd</u> and other authorities which found that there was no "joint employment" in similar circumstances where a firm could not force a contractor to terminate an individual as the <u>contractor's</u> employee. (JA 1052-53 & n.13.) Nothing in the SOP gave Howard the authority to terminate Miles as the UDC Service Center Director (JA 774-95),[7] and Miles presented no evidence that Howard had any ability through the subcontract, SOP, or otherwise, to terminate Miles as a <u>UDC</u> employee.

---

Miles despite the "reservations" of Henry Turner, then Executive Director of the Howard Lead Center. (JA 711, Pl. SMFD No. 22.)

[7]    As the court found, Howard was unable to terminate Miles as the UDC Service Center Director on its own and had to request that UDC do so (which UDC

The court below considered Miles' contention and evidence that Howard was responsible for oversight of daily operations of the UDC Service Center in such a way as to make it a "joint employer." (JA 1054-56.) For that contention, Miles relied on testimony by UDC's Dean Mahone that Henry Turner (who left in July 2010) told him that Howard was solely responsible for managing the day-to-day operations of the UDC Service Center. (Miles Br. at 5; JA 797, 820; JA 709, Pl. SMFD Nos. 6-7.) The Howard-UDC subcontract and SOP contained no such provision. (JA 1048; *see* JA 564-77, 775-95.)

The court found that Howard's oversight rights did not "convert" Howard into a joint employer because "it remained undisputed" that Miles (1) "created her own schedule," (2) was "responsible for preparing" UDC's strategy for reaching its goals "as well as its work plans," (3) had to use her own "professional judgment" when counseling clients and selecting workshop topics, and (4) that Howard "never denied permission for UDC to give a workshop" that UDC proposed. (JA 1054-55; *see* JA 713-14, Pl. SMFD Nos. 39, 41-44.)

The lower court went on to catalog the undisputed evidence that – notwithstanding Mr. Turner's alleged statement to UDC's Dean Mahone – Howard did not control day-to-day operations, especially after January 2010 (long before

---

declined to do). (JA 1052-53 n.13; JA 721, Pl. SMFD No. 133; JA 866-69.) (*See* pp. 21-22, *infra*.)

Miles became pregnant in August 2010). (JA 1054.) Most of this evidence

stemmed from admissions that Miles made at her deposition. In addition to the

factors mentioned above (pp. 7-10, *supra*), the court below noted the following,

undisputed evidence:

- Miles admitted that, after January 2010, the Service Centers "worked

more independently, and there was decreased cooperation with the Howard[] Lead

Center." (JA 1055; *see* JA 714, Pl. SMFD No. 47.)

- Miles admitted that, after Turner left Howard in July 2010, "there

[was not] much oversight relating to the operations of the [S]ervice [C]enters."

(JA 1055; *see* JA 386, Miles Tr. 56:2-17) (emphasis added.)

- Even beforehand, Miles could not recall that Mr. Turner "ever refused

to approve something she wanted to do." (JA 1055; *see* JA 714, Pl. SMFD No.

44.) During Turner's tenure, "there was little communication as to the vision and

direction of the network and the individual service centers." (JA 1037; JA 714 Pl.

SMFD No. 45.)

- No one at Howard "ever told UDC that it had [to] follow a work plan,

marketing plan, or strategic action plan written by Howard," to "change" such

plans "which [Miles] had prepared," or gave guidance following semi-annual

reports that UDC should "try doing something a little differently." (JA 1055; JA

713-14, Pl. SMFD Nos. 43, 46.)

15

All these factors led the court below to conclude that whatever "oversight that Howard exercised over the UDC Service Center did not relate to the 'essential terms and conditions of [the plaintiff's] employment, <u>Browning-Ferris</u>, 691 F.2d at 1123." (JA 1055-56.)

Miles' brief contains several misstatements of the record beyond those already noted. For example:

- Miles claims that "Howard conducted a semi-annual performance review of Miles." (Miles Br. at 8; *see* id. at 28.) But Miles admitted that she never received a performance review from Howard. (JA 173, HU SMUF No. 32; JA 380, Miles Tr. 30; JA 464, Miles Interrog. Ans., at 10.)

- Miles claims that, during monthly meetings at the Howard Lead Center, Howard "instructed Miles to conduct counseling and marketing in certain ways and instructed her as to how to hold workshops." (Miles Br. at 9.) However, the cited testimony by UDC's Dean Mahone (JA 822) is based on "what [he] was informed by Candice" (JA 822, Mahone Tr. 303:13-18) and is thus inadmissible hearsay because Dean Mahone was not present. It is also contrary to facts that Miles conceded were undisputed. (JA 713-14, Pl. SMFD Nos. 41, 43, 46, 47; JA 386, Miles Tr. 56:2-17.)

- Miles argues that Howard once "denied Miles permission to conduct a workshop" (Miles Br. at 9), though it was undisputed that "[t]he Howard Lead

Center never denied permission for UDC to give a workshop that UDC proposed."
(JA 713, Pl. SMFD No. 41.)

- Miles argues that "UDC policy" foreclosed UDC from hiring her into another UDC position in the event that "Howard pulled the funding." (Miles Br. at 9.) This contention is based solely on the "impression" and "understanding" of UDC's Dean Mahone. (JA 798, 806-07, Mahone Tr. 26-27, 96-97.) But Dean Mahone's "impression" was corrected by UDC's authoritative Rule 30(b)(6) witness on its personnel policies. She testified that Miles was eligible to be considered for other positions at UDC after Howard terminated the subcontract, but UDC did not even look for such positions. (JA 1016, UDC Blanchard [Rule 30(b)(6) witness] Tr. 38-39; JA 721, Pl. SMFD No. 141; JA 948-49; *see* JA 806, Mahone Tr. 96-97; JA 818; Mahone Tr. 171-72.)

- Miles argues that the amount of her salary was determined "by the amount of grant funding to UDC" from Howard, and that "no other source of funding existed from which to pay her." (Miles Br. at 28.) That is not supported by Miles' citations to the record. (JA 798, 818.) Miles had no knowledge how her salary was determined (JA 378, Miles Tr. 23-24), and the UDC Service Center received significant cash funding from UDC (JA 473, Mahone Tr. 20) which could have been used to fund a higher salary for Miles if UDC wished to pay her more.

17

(*See* JA 940.)  It was undisputed that, under the SOP, the UDC Service Center

established Miles' salary.  (JA 712, Pl. SMFD No. 31.)

After considering both parties' evidence, the lower court granted summary

judgment to Howard on all of Miles' claims "[b]ecause Howard was not a joint

employer under either the Spirides or Browning-Ferris tests."  (JA 1056.)

*Miles' retaliation and interference claims under the FMLA and DC FMLA.*

The court went on to rule that, even if Howard was a "joint employer" of Miles,

Howard was entitled to summary judgment on Miles' claims of "interference" and

"retaliation" under the FMLA and its local sister – the DC FMLA.  (JA 1056.)  The

court found that Miles had not "presented sufficient evidence for a reasonable jury

to find that Howard retaliated against her for exercising her rights under the FMLA

and the DC FMLA or that Howard's business reason for terminating the

subcontract – namely that the UDC Service Center was the worst-performing

Service Center in the Small Business Network – was not the real and true reason

for the termination."  (JA 1064.)

Once again, the court laid out undisputed facts that supported its finding,

considered Miles' proffered evidence, and found her assertions to be either

unsupported or not material.

- As described above, the UDC Service Center was the worst-
performing service center in the DC SBDC network – a fact not contested in

18

Miles' brief. (Miles Br. at 14; JA 1038; *see* JA 714-15, 718, Pl. SMFD Nos. 55, 58, 90; JA 953 & n.10.)  By February and March 2011, the SBA was threatening to terminate the entire DC SBDC grant for citywide services unless Howard took immediate steps to restructure the network, with ASBDC warning Howard to take a "hard look" at the UDC Service Center because it was "especially problematic." (JA 1038-39; *see* JA 715-18, Pl. SMFD Nos. 61-63, 68-69, 71, 88-90.)  ASBDC had "deferred" accreditation of the DC SBDC network, leaving it "currently unaccredited." (JA 717, Pl. SMFD No. 88.)  The entire grant was in "serious jeopardy." (JA 1039; *see* JA 717-18, Pl. SMFD No. 89.)

• In February 2011, Darrell Brown started as the new Executive Director of the Howard Lead Center. (JA 1038; *see* JA 710, Pl. SMFD No. 12.)

• Miles had become pregnant in August 2010, with an expected due date of April 3, 2011. (JA 1040; *see* JA 714, Pl. SMFD No. 50)  Because of unexpected complications, she went on leave on March 7, 2011. (JA 1040.)  Afterwards, in the remainder of March, and in April and May, there was no counseling of small-business clients at the UDC Service Center.[8] (JA 1041; *see* JA 719, Pl. SMFD Nos. 105, 120; JA 623, 631; JA 639, Brown Decl. ¶ 5.)

---

[8]    Miles had not filled the "business counselor" position at the UDC Service Center since June 2010. (JA 717, Pl. SMFD No. 79.)  Howard criticized her for failing to do so. (JA 623.)

- Miles acknowledged that, as the UDC Service Center Director, she had an "obligation to make arrangements for the servicing of [the] UDC [Service Center]'s clients while she . . . [was] out on expected maternity leave." (JA 1041; *see* JA 718, Pl. SMFD No. 97.) Miles' only "arrangement" was a "very casual conversation" she held months earlier with Mr. Hague, Director of an Anacostia Service Center, to provide counseling in Anacostia to an unspecified number of UDC's small-business clients. (JA 1041; *see* JA 719, Pl. SMFD Nos. 93, 100, 101; JA 184, HU SMUF No. 98; JA 446-47, Hague Tr. 57-60.) She did not inform the Howard Lead Center of her plan (JA 718, Pl. SMFD No. 93),[9] and she did not know if the Anacostia Service Center had the "manpower" to provide counseling to all of UDC's clients. (JA 719, Pl. SMFD No. 100.)

- Howard's Mr. Brown found Miles' plan to refer UDC counseling clients to the Anacostia Service Center to be unsatisfactory. It was undisputed that he "believed that UDC had an obligation to ensure that the Service Center is operational and functioning," and that mass referrals should be the "last option [to be] used, not the first, and not one that should have persisted for more than a few weeks." (JA 1041; JA 719, Pl. SMFD No. 105.)

---

[9]    There is also no evidence that Miles gave advance notice to her UDC supervisor (Dean Mahone) of her planned arrangement. (JA 990, HU Reply SMUF No. 103; JA 495, 522, Mahone Tr. 149-50, 263; JA 406-07, Miles Tr. 141-43.)

- On April 1, 2011, Howard representatives met with UDC's Dean Mahone and told him that UDC was underperforming, there was no Director or business consultant, and that the SBA was demanding significant corrective actions for the network. (JA 1041; *see* JA 719, Pl. SMFD Nos. 109-110.) Howard asked UDC to prepare a plan to ensure that the UDC Service Center could continue to function. (JA 1041; *see* JA 719-20, Pl. SMFD Nos. 110, 120-22.)

- Subsequently, by letter dated April 7, 2011 (JA 622), Howard advised UDC in writing of the concerns of the SBA and ASBDC, pointed out UDC's underperformance, placed the UDC Service Center on probation, requested a "Recovery Plan," and suggested that UDC replace Miles as the Service Center Director. (JA 1042.) Howard wanted to give UDC an opportunity to put its Service Center "on the road to recovery and improved performance." (JA 226, Brown Tr. 74; *see* Miles Br. at 14.)

- Among several UDC deficiencies noted in the April 7, 2011 letter, Howard criticized Miles for failing to make arrangements for continued operation of the UDC Service Center:

> [Miles] failed to make any meaningful provision for the continuation of client services at the UDC [S]ervice [C]enter. . . . . The [UDC Service] Center Director [has] essentially abandoned the [S]ervice [C]enter and its clients by her failure to take the necessary and proper steps to assure viable operation of the [S]ervice [C]enter. Further, the Center Director failed to communicate to the [Howard] Executive Director that the [S]ervice [C]enter would cease to function when she took maternity leave. Today, the

21

[S]ervice [C]enter is not functioning except for making referrals to other service centers.

(JA 1042 [emphasis added]; *see* JA 623; JA 720, Pl. SMFD Nos. 121-22.)  Later, Brown criticized UDC's Dean Mahone for his lack of planning and UDC's continued "non-functioning" state through May 2011.  (JA 616; *see* JA 231-37, Brown Tr. 95-96, 102, 108.)

- Subsequently, Howard determined that UDC had not submitted a satisfactory Recovery Plan, and warned UDC that Howard would terminate the subcontract unless UDC took several specific steps, including replacement of Miles as the UDC Service Center Director.  (JA 1043.)  With respect to Miles, Howard's Mr. Brown explained that he "wanted new leadership that had the ability to turn the [UDC Service] Center around and . . . [improve its performance], as the UDC Service Center was the worst-performing [Service] Center . . . under [Miles'] leadership."  (JA 1043; *see* JA 721, Pl. SMFD No. 133.)

- When UDC did not agree to any of Howard's suggestions, Howard terminated the UDC subcontract on May 24, 2011.  (JA 1043; *see* JA 721, Pl. SMFD No. 136.)  UDC then terminated Miles.  (JA 1043.)

- Afterwards, the SBA concluded that "Howard's termination of the . . . subcontract was managerially and strategically sound."  (JA 1043; *see* JA 721, Pl. SMFD No. 139.)  The DC SBDC later regained full accreditation from the ASBDC

22

(JA 1043; *see* JA 721, Pl. SMFD No. 139) and continued to operate. (JA 218-19, Brown Tr. 20-23; JA 368.)

The court then considered Miles' arguments that the stated reason for terminating UDC was a "pretext," but found them "individually and collectively insufficient for a reasonable jury to reach that same conclusion." (JA 1059.)

*First*, the court found no evidence of negative treatment of other persons on leave or pregnant, or any negative comments about such persons. (JA 1059-60; *see* JA 711-12, Pl. SMFD Nos. 25-26.) To the contrary, a pregnant employee of the Howard Lead Center was promoted after taking FMLA leave. (JA 1060; JA 712, Pl. SMFD No. 27.) Howard managers had considered terminating the UDC Service Center, and were unhappy with Miles' performance, before Howard knew of her pregnancy and before she took leave. (JA 1059-60; *see* JA 698; JA 177; JA 717, Pl. SMFD Nos. 81, 82.) Miles herself was concerned by December 2010 (before she informed Howard that she was pregnant) that her job was in "jeopardy" in light of the poor performance of the UDC Service Center. (JA 1063; *see* JA 714, Pl. SMFD No. 50; JA 397, 406, Miles Tr. 103-04, 140-41.)

*Second*, the court found that Miles "mischaracterize[d]" the evidence in contending that Howard "singled" out Miles' FMLA leave as the reason for putting

23

UDC on probation.[10] (JA 1060.) Instead, "probation was necessary, in part, because," <u>before</u> she went on leave, "the plaintiff failed to make arrangements for counseling services at the UDC Service Center during her absence." (JA 1060; *see* JA 718, Pl. SMFD No. 97.)

*Third*, the court below found no evidence that Howard treated Miles or the UDC Service Center differently than any Center that was similarly situated.

• While Miles argued that other Service Centers were underperforming but not terminated (Miles Br. at 10-11), the undisputed evidence showed that the UDC Service Center was the "worst performing" in the network, which UDC's Dean Mahone acknowledged.[11] (JA 1062; *see* JA 714-15, JA 718, Pl. SMFD Nos. 55, 58, 90.) The ASBDC had also singled out the UDC Service Center as "especially problematic" and as needing a "hard look" by Howard. (JA 1062-63; *see* JA 715-16, Pl. SMFD Nos. 62, 69.)

• Miles argued that no other Service Center Director was criticized for not making a "continuity plan." (JA 1059.) The court below rejected this allegation of differential treatment because the testimony from Howard's Dean Harvey "does not show either directly or indirectly [that] continuity plans were not

---

[10]    There is no evidence that Howard ever objected to Miles taking FMLA leave. (*See* JA 222, Brown Tr. 59; JA 993-94, HU Reply SMUF No. 108.)

[11]    UDC was by far the worst-performing Service Center. (JA 953 & n.10; JA 274, Wilson Decl. ¶ 24, ex. 32; JA 342; JA 976, HU Reply SMUF No. 56.)

24

required from Service Center Directors taking other types of statutory leave, as no

other Service Center Directors [who] were pregnant or planned to be on leave for

any other reason." (JA 1059 n.15; *see* JA 769, Harvey Tr. 101:17-102:21.) Miles

admitted that she had an "obligation" to develop a continuity plan in advance of a

planned extended absence. (JA 718, Pl. SMFD No. 97.) (*See* JA 800, Mahone Tr.

46:5-9; JA 232, Brown Tr. 100.)

• Miles argued (as she does now) that Howard did not terminate the

D.C. Chamber of Commerce's Service Center, which was operating without a

Director. (Miles Br. at 11.) The court found no disparate treatment because it was

undisputed that (1) "the D.C. Chamber's Service Center was not the worst-

performing center," and (2) the D.C. Chamber (unlike the UDC Service Center)

"continued to provide counseling services at its own site through a business

counselor." (JA 1062-63 n.18; *see* JA 718, Pl. SMFD No. 91.)

Altogether, the court found that there was no evidence that Miles' exercise

of her right to take FMLA leave was even a "motivating factor" in Howard's

decision to terminate the UDC subcontract. (JA 1061 n.17.) It observed that

Miles' FMLA leave "unfortunately coincided" with a "crisis point" for the DC

SBDC network. (JA 1064.)

Miles' brief cites evidence that UDC's Dean Mahone stated at the April 1,

2011 meeting with Howard that it would be "illegal" for UDC to remove Miles as

Service Center Director while she was on FMLA leave. (Miles Br. at 13; *see* JA 767-68, 801-02.) Miles also cites evidence (at 17) that UDC's Dean Mahone told Howard's Dean Harvey at a meeting that "terminating [Ms.] Miles while she was on FMLA leave was likely illegal." (Miles Br. at 17.) The undisputed evidence shows that Dean Harvey (who is not an attorney) responded "[y]ou may be right" but that Howard was not seeking the termination of Miles as a UDC employee, but only a "leadership change" for the UDC Service Center Director. (JA 883, Harvey Tr. 18-19; JA 203, Harvey Tr. 22-24.)

However, it was undisputed that Dean Mahone had not consulted an attorney, and he erroneously believed that UDC could not terminate Miles even if it had a legitimate business reason for doing so. (JA 496-97, Mahone Tr. 159, 161) Howard's Mr. Brown understood that it was permissible for an employee to be replaced while on FMLA leave if there were legitimate business reasons for doing so. (JA 243, Brown Tr. 159.) Also, Miles presented no evidence to dispute Howard's evidence that it never asked UDC to terminate Miles as a UDC employee. (JA 744, Pl. SMFD No. 114; JA 515, Mahone Tr. 236; JA 237, 243, Brown Tr. 117, 160.)

*The lower court dismissed the Title VII and DCHRA claims.* Based on the same undisputed facts relating to the FMLA and DC FMLA claims, the lower court dismissed the Title VII and DCHRA claims of gender, pregnancy, and

family-responsibility discrimination because there was "insufficient evidence to

demonstrate that Howard's proffered business reason is merely pretext for

discrimination." (JA 1065.) The court also had found no evidence of

"discriminatory animus." (JA 1059-60.)

## SUMMARY OF ARGUMENT

The lower court based its ruling on a thorough review of both parties'

evidence. It did not ignore Miles' evidence, or fail to draw inferences in her favor,

as claimed in Miles' brief. Instead, the lower court relied on the extensive amount

of undisputed evidence, and it identified those of Miles' factual contentions that

were either unsupported by the record or not material.

No reasonable jury could find that Howard was Miles' "joint employer." She

controlled her own work schedule, worked at UDC, prepared her own strategic and

work plans for the UDC Service Center, and exercised her professional judgment

in performing her duties. UDC, and not Howard, paid her and controlled all

conventional aspects of her employment (*e.g.*, payment, leave, discipline, benefits).

Miles has no support for her contentions that Howard controlled her hiring

and termination, and exercised control over her day-to-day activities, so as to

render Howard her "joint employer." Those contentions are contrary to undisputed

facts, and also to well-established law including this Circuit's ruling in Redd. As

Redd and other courts have ruled, a firm's right to "pre-screen" a subcontractor's

27

employee, or to cancel a subcontract, do not support "joint employer" status. Courts have also repeatedly ruled that a firm's quality-control supervision over training, staffing, and similar functions (like that available to Howard) does not support "joint employer" status. Miles presented no contrary authority.

The lower court also correctly ruled that Miles had presented insufficient evidence for a reasonable jury to find that Howard's stated reason for terminating the UDC subcontract was a pretext for violation of the FMLA, DC FMLA, DCHRA, or Title VII. The undisputed evidence showed that the UDC Service Center was the worst-performing center in the DC SBDC network, it had been singled out for a "hard look" and as "especially problematic" by ASBDC, and even Miles had been concerned about its survival before she disclosed her pregnancy to anyone at Howard. The undisputed evidence also shows that Howard was facing intense pressure from SBA in Spring 2011 to restructure the network. While Miles' pregnancy and leave unfortunately coincided with a "crisis point" for the DC SBDC network, Howard nonetheless had a legitimate business reason for terminating the UDC subcontract due to that crisis. Miles presented no evidence to support her implausible claim that Howard chose to shut an entire Service Center in order to punish her for taking leave.

28

## STANDARD OF REVIEW

The lower court's summary-judgment rulings are subject to *de novo* review by this Court. Solomon v. Vilsack, 763 F.3d 1, 8 (D.C. Cir. 2014).

The summary-judgment principles cited by Miles (at 21-22) are accurate, but incomplete.

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As this Court recently explained, a dispute about a material fact is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Burley v. Nat'l Passenger Rail Corp., No. 14-7051, 2015 U.S. App. LEXIS 16626, at *8 (D.C. Cir. Sept. 18, 2015), *quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). While reasonable inferences must be drawn in favor of the non-movant, such inferences must be "justifiable." Anderson, 477 U.S. at 255. The mere existence of a "scintilla of evidence" supporting the non-movant is not enough to avoid summary judgment. Anderson, 477 U.S. at 252. *See* Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

A non-movant cannot avoid summary judgment based on "sheer hearsay" where the person who allegedly made a statement does not support it. Wilburn v.

29

Robinson, 480 F.3d 1140, 1143 n.2 (D.C. Cir. 2007). *See* Gleklen v. Democratic

Cong. Campaign Comm., Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000).

## ARGUMENT

### I.    THE LOWER COURT PROPERLY RULED THAT HOWARD WAS NOT A "JOINT EMPLOYER" OF MILES

It is common ground that Howard could have no liability to Miles under the

FMLA, DC FMLA, DCHRA, or Title VII unless Howard was an "employer," and

more specifically, a "joint employer," of Miles.  29 U.S.C. § 2615; D.C. Code §

32-507; D.C. Code § 2-1402.11(a)(1); 42 U.S.C. § 2000e-5.  (*See* JA 145.)

Miles does not challenge the lower court's focus on the Spirides and

Browning-Ferris "tests" for determining whether Howard was a "joint employer"

under these statutes.[12]  Miles proposed no other standard in her summary-judgment

brief or on appeal.

This Circuit has not definitively ruled which of the two tests is appropriate,

though this Court's 2000 ruling in Redd appeared to express a preference for the

Browning-Ferris test, 232 F.3d at 940, which was also applied in an NLRB case.

Dunkin' Donuts Mid-Atlantic Distribution Ctr., Inc. v. NLRB, 363 F.3d 437, 440

(D.C. Cir. 2004).  As noted above, the Browning-Ferris test focuses on whether

---

[12]    Substantively, the FMLA and DC FMLA are construed in the same fashion.
Chang v. Inst. for Pub.-Private P'ships, Inc., 846 A.2d 318, 329 (D.C. 2004).
Similarly, the DCHRA is construed consistently with Title VII.  Kumar v. D.C.
Sewer & Water Auth., 25 A.3d 9, 16-17 (D.C. 2011).

two firms "*share* or co-determine those matters governing the essential terms and conditions of employment." Browning-Ferris, 691 F.2d at 1123 (emphasis in original). *See* Dunkin' Donuts, 363 F.3d at 440.[13]

Miles argues that this question is "essentially a factual issue," and her appeal of the lower court's "joint employment" ruling rests entirely on the lower court's supposed failure to consider Miles' evidence. (Miles Br. at 25.) However, courts have often affirmed the grant of summary-judgment against factually-unsupported "joint employment" claims, as this Circuit did in Redd, 232 F.3d at 941, and other Circuits have done more recently. *E.g.*, Knitter v. Corvias Military Living, LLC, 758 F.3d 1214 (10th Cir. 2014); Plaso v. IJKG, LLC, 553 F. App'x 199, 205 (3d Cir. 2014); Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr., 536 F.3d 640, 644-45 (7th Cir. 2008); Cruz-Lovo v. Ryder Sys., Inc., 298 F. Supp. 2d 1248, 1255-59 (S.D. Fla.), *aff'd*, No. 03-11247, 2003 WL 23150113 (11th Cir. 2003).

Because of Miles' fact-based appeal, in the Counter-Statement of the Case we documented in detail the extensive undisputed evidence that the lower court

---

[13]    The court below noted that factors to be considered under the Browning-Ferris test include (a) the alleged employer's "authority to hire and fire the relevant employees," (b) the "alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment:  compensation, benefits, and work schedules, including the rate and method of payment," (c) the "alleged employer's involvement in day-to-day employee supervision, including employee discipline," and (d) the "alleged employer's actual control of employee records, such as payroll, insurance, or taxes."  In re Enter. Rent-A-Car Wage & Hour Emp't Practices Litig., 683 F.3d 462, 469 (3d Cir. 2012).  (JA 1052.)

relied upon, and showed how the lower court considered Miles' evidence and found it either not material or unsupported by the record. We have already debunked many of Miles' factual contentions on the "joint employment" issue, pointing out how the record does not support them.

Significantly, Miles does not challenge or rebut any of the legal authority on which the lower court relied for its conclusions on the three primary issues that Miles focuses on: (1) Howard's alleged control over her hiring, (2) Howard's alleged *de facto* ability to terminate her UDC employment by terminating the subcontract, and (3) Howard's supposed tight control "as to the details" of how Miles was to achieve results. (Miles Br. at 26-27.) That legal authority refutes Miles' contentions.

*First*, Miles claims that Howard's right to "concur" the hiring of a UDC Service Center Director, demonstrates Howard's "control"[14] over the terms and conditions of Miles' employment. (Miles Br. at 26.) But as the lower court found (JA 1052), such "authority to 'pre-screen' candidates for a particular position does not equate to a sufficient control of the terms and conditions of the plaintiff's employment because once a Service Center Director is hired, Howard lacks the authority to file the Director." (JA 1052.) The lower court relied on Redd, where

---

[14] We have already shown (p. 12 n.6, *supra*) that Howard did not, as alleged, have the ability to force UDC to hire Miles or any particular individual as Service Center Director.

this court found no "joint employment" where one firm had the "right to reject" any guide proposed by a contractor, 232 F.3d at 940, as well other rulings.  Simms v. D.C. Gov't, 587 F. Supp. 2d 269, 274-75 (D.D.C. 2008) (right to "pre-screen" contractor's employees does not amount to control because, "once the employee is hired," the contractor "lacks the authority to fire the employee").[15]  (JA 1052-53 n.13.)  Miles offered no contrary authority.

*Second*, Miles offers no legal support for her contention that Howard was a "joint employer" because it could take steps that allegedly affected the viability of Miles' continued employment with UDC.  The lower court rejected Miles' contention.  (JA 1053-54.)

Miles does not claim that Howard had the direct power to terminate Miles as a UDC employee, or even as the UDC Service Center Director, short of doing so indirectly by terminating the entire UDC subcontract.  The court below found that Howard had no such direct power (JA 1053 n.13), and this was supported by undisputed facts.  (*See* pp. 13, 21-22, *supra*.)

---

[15]     The court also cited Santichen v. Greater Johnstown Water Auth., No. 06-cv-72 (KRG), 2008 WL 868212, at *10 (W.D. Pa. Mar. 31, 2008) (no "joint employment" where firm had the right to monitor personnel decisions, but "did not reserve the right to direct the hiring (or dismissal) of a particular employee," even though the contractor had the right to agree as to who hired).  (JA 1053.) *See* Spears v. Choctaw Cnty. Comm'n, No. 07-275, 2009 WL 2365188, at *8 (S.D. Ala. July 30, 2009).

The court below relied on this Court's holding in <u>Redd</u> that a client's ability to instruct a contractor to no longer assign one of its workers to the client's project does not support treating the client as the joint employer of the contractor's worker:

> [W]hile the contract gives the [client] the right to reject any guide [working for the contractor], under the contract the decision to terminate the guide's employment with [the contractor] is solely within [the contractor's] power. To pursue the landscape example: the client's command to remove a specific worker (say, on grounds of rudeness or just personal incompatibility) would hardly render the worker an employee of the client.

<u>Redd</u>, 232 F.3d at 940.

Thus, under <u>Redd</u>, even if Howard had the power to replace Miles as the UDC Service Center Director (which it did not have), that would not support her "joint employment" claim.

The court below also ruled that "Howard's ability to not renew the subcontract with UDC does not confer upon itself the actual authority to terminate the plaintiff's employment." (JA 1052 n.13.) The court below cited <u>Simms</u>, which held that there was no joint employment when the termination of a contractor's employee resulted from the client's "decision not to renew the contract" with the contractor and the client "did not have the authority to terminate [the contractor's] employees." 587 F. Supp. 2d at 274. The court also cited <u>Vrabel v. Greater Johnstown Water Auth.</u>, No. 3:2006-73, 2008 WL 868152, at *11 (W.D. Pa. Mar.

31, 2008) ("the mere fact that [plaintiff's] termination was incidentally caused by a decision made by the [client to terminate its contract with plaintiff's employer] did not transform the [client] into his employer"); and Santichen, 2008 WL 868212, at *11 (same). (JA 1053 n.13.) The Tenth Circuit recently reached the same result. Knitter, 758 F.3d at 1229 (rejecting claim that a firm was a joint employer where it "lacked the power to fire" a contractor's employee, even if the firm could "effectively forc[e]" a contractor to terminate her employment by "requesting that she no longer be sent" to the client). *See* Morrison v. Magic Carpet Aviation, 383 F.3d 1253, 1255 (11th Cir. 2004) ("The simple fact that a major client can pressure an employer into firing a particular individual does not transmute that client into that individual's employer").

Miles offers no contrary authority for her contention, which would turn every firm that hires a subcontractor into a "joint employer" of the latter's workers by sheer dint of terminating the subcontract. Miles also mistakenly argues that Howard's termination of the subcontract "had the necessary effect" of terminating Miles' employment with UDC (Miles Br. at 27), though the undisputed facts show that she was eligible for other employment at UDC but UDC did not even look for another available job for her. (*See* p. 17, *supra*.)

*Third*, Miles offers no legal support for her contention that Howard's quality-control oversight of its UDC subcontractor was sufficient to render Howard

35

a "joint employer" of UDC's employees.  In <u>Redd</u>, this Court posed the question as

whether "the business is exercising a degree of control that seems excessive in

comparison to a reasonable client-contractor relationship in the same

circumstances."  232 F.3d at 939.

Miles offered no comparative evidence directed to this point.  She did not

present any evidence that the subcontracting arrangement was a "sham," <u>Redd</u>, 232

F.3d at 939, or anything other than a "prudent business" arrangement as the lower

court found.  (JA 1050.)  As the court below noted, in <u>Redd</u>, this Court listed

factors suggesting a lack of joint employment, such as when the "subcontractor

pays the employee, affords the employee leave, and provides the place of work."

(JA 1050, *citing* <u>Redd</u>, 232 F.3d at 939, 940.)  The same factors indicate a lack of

"joint employment" here.  (JA 1050.)  (*See* pp. 8-10, *supra*.)

As the lower court noted, as in <u>Redd</u>, Howard exercised scant control over

the day-to-day activities of Miles or the UDC Service Center, and Miles admitted

"there [was not] much oversight relating to the operations of the [S]ervice

[C]enters" after Mr. Turner's departure in July 2010, and not much earlier.  (JA

1055.)  (*See* p. 15, *supra*.)  Howard had no right under the subcontract or SOP to

control day-to-day operations.  (JA 1048; JA 564-77, 775-95; *see* pp. 14-16 *supra*.)

Furthermore, courts have consistently ruled that quality-control oversight of

subcontracting or similar arrangements (such as training, monitoring, or pre-

screening staff) do not create "joint employment," even where such oversight is much more extensive than indicated by the undisputed facts in this case. *E.g.*, Orozco v. Plackis, 757 F.3d 445, 451 (5th Cir. 2014) (a franchisor's provision of "training" and "advice" to underperforming franchises, and emails communicating the franchisor's "broad policies," did not support treating the franchisor as a "joint employer" for FLSA purposes); Knitter, 758 F. 3d 1230 (client was not a joint employer of a contractor's employees where the client's managers "supervised the [plaintiff's] daily work to the extent they provided instruction on how to perform certain tasks and notified the [plaintiffs] if their work did not meet [the firm's] standards," but did not have broader supervision or authority to discipline or directly terminate the plaintiffs); Moreau v. Air France, 356 F.3d 942, 951 (9th Cir. 2004) (supervision of workers not indicative of joint employment where contractor was "very specific about how it wanted its work performed, and [the contractor] checked to ensure that its standards were met and that the [subcontractor's] overall performance adhered to [the contractor's] specifications"); Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 690 (D. Md. 2010) ("[S]upervision and control is probative of an employment relationship only when the oversight demonstrates effective control over the schedule and conditions of employment"). *See* Zheng v. Liberty Apparel Co., 355 F.3d 61, 75 (2d Cir. 2003) ("supervision with respect to [the] contractual warranties of quality and time of delivery has no bearing on the

37

joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement").

Miles provided no contrary authority. This Court should affirm the lower court's ruling that no reasonable jury could find that Howard was a "joint employer" of Miles (JA 1052), and that all her claims should therefore be dismissed.

## II.   IN ITS ALTERNATIVE RULING, THE LOWER COURT PROPERLY GRANTED SUMMARY JUDGMENT ON THE FMLA AND DC FMLA CLAIMS

As an independent ground for granting summary judgment to Howard on Miles' "interference" and "retaliation" claims under the FMLA and DC FMLA, the lower court found that Miles had failed to present sufficient evidence from which a reasonable jury could find that Howard's stated "legitimate business reason" for terminating the UDC subcontract (namely, that UDC was the worst performing center in the DC SBDC network) was not the "actual reason" for terminating the subcontract. (JA 1064.)

The award of summary judgment on FMLA and DC FMLA claims has been affirmed by this Circuit where a plaintiff falls "far short of rebutting" an employer's proffered "reasonable and non-discriminatory reasons" for its decision. Gleklen, 199 F.3d at 1368-69. This is such a case.

38

Miles does not dispute that, once Howard proffered a legitimate business reason for terminating the subcontract, she bore the burden of showing that "the proffered reasons were pretextual or that the employer took the adverse action because the employee engaged in protected activity." (Miles Br. at 30.) The court below followed this basic principle (JA 1057-58), which is consistent with Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).

Under Brady, if the employer's "stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." 520 F.3d at 495 (emphasis added). In addition, in evaluating whether actions are pretextual, courts do not act as a "super-personnel department that re-examines an entity's business decisions." Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999).

In her brief and in the proceedings below, Miles did not even attempt to show that Howard lacked a reasonable belief that "the UDC Service Center was the worst-performing center in the network." (JA 1058; see JA 714-19, Pl. SMFD No. 54-55, 58, 90.) Miles also does not contest Howard's reasonable belief that UDC's performance would not improve (JA 1058); indeed, Miles claims that the UDC Service Center was doomed to continued failure. (Miles Br. at 10-11, 32.) Miles also did not dispute that Howard's Mr. Brown genuinely "believed that UDC had an obligation to 'ensure that the Service Center is operational and functioning'" at

all times. (JA 719, Pl. SMFD No. 105.) As in <u>Gleklen</u>, summary judgment is appropriate where there is no evidence to refute evidence showing that the employer "reasonably believed" its explanation.   199 F.3d at 1369.

Nor does Miles challenge the court's finding that there was no evidence that Howard had any "discriminatory animus" toward persons who took family or medical leave.[16] (JA 1059-60.)

Miles instead claims that the lower court "fail[ed] properly to acknowledge key evidence offered by Miles." (Miles Br. at 29.) However, as documented in detail in the Counter-Statement of Facts (pp. 18-26, *supra*), the court below <u>did</u> consider Miles' evidence. We have already debunked most of Miles' contentions.

- Miles launches her factual attack by claiming that Howard "singled out Miles's FMLA leave as a reason for placing the UDC Center on probation." (Miles Br. at 31.) As discussed above (pp. 24-25, *supra*), the lower court addressed this contention and correctly found that it "mischaracterized" the evidence. (JA 1060.) In actuality, Howard criticized the UDC Service Center for a series of performance problems (JA 623), one of which was "fail[ing] to make arrangements for counseling services at the UDC Service Center during [Miles'] absence." (JA 1060.) Thus, Miles was criticized as a manager for not making

---

[16]     The absence of any negative comments about FMLA leave distinguishes this case from <u>Gordon v. U.S. Capitol Police</u>, 778 F.3d 158, 160, 163 (D.C. Cir. 2015).

satisfactory plans <u>before</u> she took leave, and Miles has acknowledged that she had an "obligation" to do so.[17] (JA 718, Pl. SMFD No. 97; JA 622-23.) (*See* pp. 19-20, 23, *supra*.)  No counseling was provided at the UDC Service Center for any period after Miles went on leave. (*See* p. 19, *supra*.)

- Miles claims that Howard's Dean Harvey testified that "Howard's requirement of a continuity plan only applied to Miles because she was pregnant." (Miles Br. at 31.)  Not so.  The court below correctly found that Dean Harvey's actual testimony does not support this description "directly or indirectly." (JA 1059 n.15; *see* JA 769, Harvey Tr. 101:17-102:21.)  Furthermore, Miles admitted that she had an "obligation" to develop a continuity plan (JA 718, Pl. SMFD No. 97); UDC's Dean Mahone had "operated before" to develop a "continuity plan" (JA 800, Mahone Tr. 46:5-9); and the new Executive Director of the Howard Lead Center testified that he generally expected an organization to make plans to "ensure that work continues." (JA 232, Brown Tr. 100.)

- Miles argues that UDC was treated differently than other Service Centers, though "the performance of the DC SBDC network as a whole" was unsatisfactory. (Miles Br. at 31-32.)  Again, the court below addressed this point, and properly rejected it because the undisputed evidence showed that the UDC

---

[17]     Miles does not claim that it violates the FMLA for an employer to fault a manager who fails to make or communicate a satisfactory plan to cover her work during an expected, extended absence. (*See* JA 157.)

Service Center was the "worst performing" one in the network. (JA 1062; *see* JA
714-15, JA 714, 715, 718, Pl. SMFD Nos. 55, 58, 90.) The court also noted that
ASBDC had singled out the UDC Service Center as "especially problematic" and
as needing a "hard look" by Howard. (JA 1062-63; *see* JA 715-16, Pl. SMFD Nos.
62, 69.) (*See* pp. 3, 18-19, *supra*.)

- Miles alleges that the D.C. Chamber of Commerce Service Center was
not treated as harshly, though it allegedly was an "equally non-functioning Service
Center." (Miles Br. 34.) As noted above (p. 25, *supra*), the court correctly
rejected that contention because "the D.C. Chamber's Service Center was not the
worst-performing center,"[18] and the D.C. Chamber (unlike the UDC Service
Center) "continued to provide counseling services at its own site through a
business counselor." (JA 1062-63 n.18; *see* JA 718, Pl. SMFD No. 91.) As a
matter of law, Miles is unable to show that the D.C. Chamber is a relevant
comparator unless "all of the relevant aspects" of its situation were "nearly
identical" to the UDC Service Center. Neuren v. Adduci, Mastriani, Meeks &
Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995). Miles did not show that this was so.

- Miles argues that Howard's failure to terminate the UDC subcontract
in earlier periods in which it was underperforming demonstrates that Howard's

---

[18]     In actuality, the D.C. Chamber of Commerce performed substantially better
in 2010 than the UDC Service Center, with almost three times as many clients and
twice the number of counseling hours. (JA 954.)

decision to do so on that basis in 2011 was pretextual. (Miles Br. at 33-34.)
However, the court below noted that the status of the DC SBDC network "reached
a crisis point" by March 2011. (JA 1063.) There was no evidence that the entire
SBA grant had been in "serious jeopardy" in prior years (JA 717-18, Pl. SMFD
No. 89), that accreditation of the network had previously been lost (JA 717, Pl.
SMFD No. 88), or that the ASBDC had previously singled out the UDC Service
Center as "especially problematic." (JA 715, Pl. SMFD No. 62.) The SBA
considered Howard's decision to terminate the UDC subcontract in 2011 to be
"managerially and strategically sound." (JA 721, Pl. SMFD No. 139.)

Miles' argument contains several new contentions, which once again are not
supported by the evidence.

- Miles claims that UDC's Dean Mahone "did not believe that the UDC
[Service] Center's underperformance had anything to do with Miles' leadership."
(Miles Br. 33; JA 811, Mahone Tr. 118.) Dean Mahone's belief is not a material
fact, but in any event Miles' contention is incorrect. Miles ignored Dean Mahone's
later testimony on cross-examination that "[p]art of" the reason for UDC's poor
performance was "the performance of the director," and Miles could have done
better in several key areas. (JA 503, 509, Mahone Tr. 188, 211-12.) UDC's Dean
Mahone had no explanation when asked why the UDC Service Center was the
worst-performing one. (JA 811, Mahone Tr. 11.)

43

- Miles claims that Howard's Mr. Brown became "singularly focused on the UDC Service Center after he learned that Miles was out on maternity leave" and did not apply "scrutiny" to other service centers. (Miles Br. 32-33.) The only evidence cited is a passage from the deposition of UDC Dean Mahone (JA 810-11) where Dean Mahone testified that he had "no concrete discussion" with Howard's Mr. Brown (or his predecessor Mr. Turner) "as to why every center in the network is not performing." (JA 811, Mahone Tr. 117:4-9.) Howard's failure to discuss the oversight of other centers with UDC's Dean Mahone (who had no responsibility for them) is not evidence that Howard ignored issues at other service centers. The evidence shows that Howard focused on the entire DC SBDC network (JA 955 n.13; JA 1021-33, Brown Tr. 45-49, 141-42 & ex. 3), and informed UDC's Dean Mahone in writing that Howard was reviewing "all the sub-awardees' contracts." (JA 623.) Moreover, it is undisputed that Howard, the ASBDC, and even Miles had concerns about the viability of the UDC Service Center before Miles told anyone at Howard of her pregnancy. (JA 714-17, Pl. SMFD Nos. 50, 54, 58, 61-63, 65, 67, 69, 72, 81, 82; JA 397, 406, Miles Tr. 103-04, 140-41.)

- Finally, Miles argues that the "temporal proximity" between Miles' FMLA leave and the threats to terminate the UDC Service Center is "probative of retaliatory intent." (Miles Br. 34.) While "temporal proximity" may support a

*prima facie* case, it does not suffice on its own to counter an employer's legitimate business reason. <u>Gleklen</u>, 199 F.3d at 1368. *See* <u>Hopkins v. Grant Thornton Int'l</u>, 851 F. Supp. 2d 146, 154 (D.D.C. 2012), *aff'd*, 529 Fed. App'x 1, 3, 2013 U.S. App. LEXIS 9171, at *4 (D.C. Cir. May 3, 2013); <u>Gibbs v. WMATA</u>, 48 F. Supp. 3d 110, 134 (D.D.C. 2014).

This Court should affirm the lower court's alternative ruling that Miles failed to present sufficient evidence to support her FMLA and DC FMLA claims.

## III.    IN ANOTHER ALTERNATIVE RULING, THE LOWER COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON MILES' CLAIMS UNDER THE DCHRA AND TITLE VII

The lower court dismissed Miles claims under the DCHRA and Title VII upon finding that Howard was not a "joint employer" of Miles.

In an alternative ruling, the court granted Howard summary judgment on Miles' DCHRA and Title VII claims (based on gender, pregnancy, and family responsibilities) because the court had already found there was "insufficient evidence to demonstrate that Howard's proffered business reason is merely [a] pretext for discrimination." (JA 1065.)  The court applied the same "analytical framework for ... [a] claim of retaliation [under the FMLA]" (JA 1065), and Miles does not challenge that approach. *See* <u>McFadden v. Ballard Spahr Andrews & Ingersoll, LLP</u>, 611 F.3d 1, 6 (D.C. Cir. 2010); <u>Gleklen</u>, 199 F.3d at 1367.

Therefore, Miles effectively concedes that if this Court affirms the award of summary judgment to Howard on Miles' FMLA and DC FMLA claims, then it should also affirm the award of summary judgment on Miles' DCHRA and Title VII. (Miles Br. 35.)  This Court should affirm on this basis.

The court below also found that there was no evidence of any discriminatory animus based on gender, pregnancy, or family responsibilities.  (JA 1059-60, 1065.)  The facts supporting that conclusion were undisputed.  (JA 709-12, Pl. SMFD Nos. 6-9, 13, 16, 27, 92.)  Miles did not challenge that finding in her brief (at 35-36), and therefore concedes it.[19]  New York v. EPA, 413 F.3d 3, 20 (D.C. Cir. 2005) (argument "not made . . . in . . . opening brief . . . is . . . waived").

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment below.

Respectfully submitted,

Daniel I. Prywes (Counsel of Record)
Brenda A. González
BRYAN CAVE LLP
1155 F Street, N.W.
Washington, DC  20004
(202) 508-6000

Dated:  October 21, 2015          *Counsel for Appellee Howard University*

---

[19]     Absent evidence of discriminatory animus based on a protected class (such as gender or family responsibilities), Miles has no claim under Title VII or the DCHRA even assuming *arguendo* that Howard interfered with leave requirements under the FMLA or DC FMLA.  Brady, 520 F.3d at 494.  (*See* JA 163.)

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[x]  this brief contains 10,871 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); or

[ ]  this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[x]  this brief has been prepared in a proportionally spaced typeface using [Microsoft Word 2010] in [14 pt Times New Roman], or

[ ]  this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: October 21, 2015

Daniel I. Prywes
*Attorney for Appellee*

47

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I hereby certify that on October 21, 2015, I caused this Brief of Appellee

Howard University to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF Users:

> Nicholas Woodfield, Esq.
> R. Scott Oswald, Esq.
> Employment Law Group, P.C.
> 888 17th Street, NW, 9th floor
> Washington, DC 20006

> Counsel for Appellant

I further certify that on October 21, 2015, I caused the required copies of the

Brief of Appellee Howard University to be hand filed with the Clerk of the Court.

Daniel I. Prywes
Counsel for Appellee Howard University